**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| YUHANNA A. SHERRIFF, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:20-CV-0989-E (BH) |
| | ) | |
| MARK CHRISTIAN, et al., | ) | |
| Defendants. | ) | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings and applicable law, *Defendants' Motion to Dismiss and Memorandum in Support Thereof*, received on October 2, 2020 (doc. 28), should be granted in part, and the plaintiff's claims should be dismissed.

## I. BACKGROUND

Alleging violation of his rights under the Eighth Amendment to the Constitution, Yuhanna A. Sherriff (Plaintiff) sues the former acting safety administrator, Mark Christian (Administrator), and the former assistant warden Gerardo Rozales (Warden) (Defendants), of the Federal Correctional Institution in Seagoville, Texas (FCI-Seagoville), in their individual capacities. (doc. 3 at 3, 6, 9-10.)[2] He claims that Defendants were deliberately indifferent to the serious risk of harm to him from exposure to asbestos and mold while working in a warehouse at FCI-Seagoville, where he is incarcerated. (*See id.*)

A.    **The Warehouse**

Plaintiff alleges that the FCI-Seagoville warehouse was built in the late 1930's, so it is presumed to have been constructed with and using "Asbestos containing material." (*Id.* at 10 (citing

---

[1] By *Special Order No. 3-251*, this *pro se* prisoner case has been automatically referred for full case management.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

29 CFR § 19.10.1001(a)(b) and j(2)).) It was previously abated due to asbestos on the pipes. (*Id.*) In another inmate's office, the flooring was partially removed "due to asbestos in the tile." (*Id.* at 10-11.); *see also* (doc. 7 at 7) (Answers to First Magistrate Judge's Questionnaire (MJQ)).[3] Plaintiff alleges the existence of a report generated many years ago which states that the warehouse was asbestos free. (doc. 3 at 11.)

The warehouse itself contains two storage rooms with freezers (storage areas 1 and 2) that previously stored food and other items. (*Id.*) From October 1, 2013 through about July 1, 2017, there were issues with the freezers "breaking down." (*Id.*) The freezer in storage area 1 broke down for the last time on April 1, 2017. (*Id.*) On or about May 1, 2017, it was determined that storage area 1 should be converted to "dry storage" due to the Assistant Food Service Administrator observing the inmates' food covered with a fine dust and chunks of black substances that had fallen from the ceiling. (*Id.* at 11-12.)

In early July 2017, the warehouse supervisor directed inmates to start dismantling and removing the shelving systems from storage area 1. (*Id.* at 12.) Inmates personally cleaned each piece of the storage shelf system, ehich was covered in an accumulated "dirty dry substance" and "black surfaces substances." (*Id.*) After removing the shelves, inmates cleaned storage area 1 of all dust and falling debris and tore down the walls. (*Id.*) At no time were the inmates provided protective gear or informed that the substance they were cleaning contained asbestos, but the poor

---

[3] There are some discrepancies in the dates in the original complaint and Plaintiff's answers to a magistrate judge's questionnaire (MJQ). The complaint alleges that Defendants initially visited the warehouse on September 23, 2017, (doc. 3 at 13), but the answers state that this visit took place on September 31, 2017, (doc. 7 at 1). The complaint also claims that Administrator tested hazardous "black substances" on October 20, 2017, and then sprayed "some substances to combat the mildew diagnosis" on October 27, 2017 (doc. 3 at 13), but the answers claim that Administrator both sprayed and tested the black substances on October 27, 2017, (doc. 7 at 3). Because a plaintiff's answers to a questionnaire serve as an amendment to the complaint, *see Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994), the dates provided in the answers are considered the operative dates.

air quality in storage area 1, which contained asbestos and mold, caused inmates to suffer upper respiratory issues and bloody noses. (*Id.*)

On or about September 1, 2017, in response to the frequent complaints of upper respiratory issues and bleeding noses, the warehouse supervisor emailed Administrator about the falling substances in both storage areas, as well as a strong odor emanating from them. (*Id.* at 13.) On or about September 30, 2017, Warden, Administrator, and other individuals examined the warehouse. (doc. 7 at 1, 3.) Administrator tested the black substance in both storage areas on or about October 27, 2017, and determined that the substance and smell was only mildew. (doc. 7 at 2.) He did not, however, address the substance falling from the ceiling. (doc. 3 at 13.) That same day, after instructing the inmates to remove all property from both storage areas, and while wearing a full body suit and respiratory protection, Administrator sprayed a "soapy smelling substance" in both storage areas. (doc. 7 at 2.) The warehouse supervisor then ordered the inmates to clean and then return all property to its respective storage room. (doc. 3 at 14.)

Warden agreed with the testing methodology and results and "did not take into consideration the hazardous materials, i.e., asbestos, found rampant in the warehouse historically." (*Id.;* doc. 7 at 3.) Nor did he address the falling substance, which Plaintiff alleges created an unsafe working condition in both storage areas. (*Id*.)

After Administrator's visit, inmates still experienced nose bleeds and significant upper respiratory breathing issues upon entering the storage areas, which they reported to their direct supervisor. (doc. 3 at 14; doc. 7 at 2.) The storage areas still had substances, and ceiling tile, falling from the ceilings that the inmates had to continually clean. (doc. 3 at 14.) Due to the lack of ventilation and humidity in the storage areas, the ceiling became dry and crumbled; mold began to

grow after the freezers broke down, causing the ceiling installation to fall and shatter on the items below. (*Id.* at 14-15.) Plaintiff emphasizes that the source of the asbestos was the ceiling installation, which contained friable asbestos and mold. (*Id.* at 15 (citing 29 CFR § 1910.1001, Appendix C(1)).) Until January 15, 2018, when the storage areas were equipped with new doors allowing air to filter in and out from the breeze way, "both inmates and staff had been working in a condition where the air flow movement was uninhibited in the breeze-way and the storage areas." (*Id.*)

In July 2018, a new safety administrator visited the warehouse. (*Id.* at 18) There were no other visits by safety personnel or administrators until October 2018—three months after Administrator and Warden left FCI-Seagoville. (*Id.* at 17-18.) On or around October 9, 2018, the new safety administrator tested the substances falling from the ceilings in the storage areas. (*Id.* at 18.) He then placed signs on the doorways of the storage areas stating, "Danger, Asbestos, [sic] May Cause Cancer Cause Damage to Lungs, Authorized Personnell [sic] only. 29 CFR [1910.1001(j)(4)(1)] C. Rees, Safety Manager, Ext. 4431." (*Id.* at 19.) The new safety administrator informed the warehouse supervisor and inmates that the crumbled substance prevalent in both storage areas contained 10% asbestos and mold. (*Id.*) This finding was confirmed by the "person testing air-quality" who relayed the results of the test to another inmate. (*Id.*) The new safety administrator then restricted air flow coming into and out of the storage areas by covering the same with plastic. (*Id.*)

After the sealing of the storage areas on or around October 9, 2018, the storage areas were dormant, with air-flow restricted. (*Id.* at 20.) The new safety administrator informed others that all toilet paper, mattresses, washers, and dryers, and cardboard boxes in the storage areas needed to be abated and destroyed. (*Id.*) On October 31, 2018, the new safety administrator issued a

memorandum reporting the finding of asbestos in both storage areas.[4] (*Id.* at 57). It specifically states that testing revealed the presence of asbestos-containing materials in the warehouse, but two air samples read negative for the presence of airborne asbestos. (*Id.*)

## B.   <u>Plaintiff's Exposure</u>

Plaintiff worked at the warehouse from approximately January 29, 2018, until December 9, 2018. (*Id.* at 15) He was responsible for cleaning falling debris from both storage areas, which contained black and dry substances; crushing the ceiling installation so that it could fit in the trash compactor; sweeping and mopping all the debris to ensure that the storage areas remained clean; dismantling the shelves in storage area 2, which were covered with debris from the ceiling; and removing or adding "institutional properties" upon request from the warehouse supervisor or staff. (*Id.* at 15-16; doc. 7 at 7-8.) During the cleaning process for storage area 2, the ceiling was "falling apart and there was black and dry substance all over the floor, including the part of the ceiling that was hanging down." (doc. 7 at 7.) Plaintiff claims that immediately upon entering the breeze-way of the warehouse where the storage areas were located, he could smell a strong distinct odor. (*Id.*) He inquired as to the insulation over the piping in the warehouse and was informed that the warehouse had been insulated due to asbestos exposure. (*Id.*) The warehouse supervisor instructed Plaintiff to keep the doors to storage areas 1 and 2 closed when not moving property into or out of those areas. (*Id.* at 8.) At no point during the process did Plaintiff, or any other inmate, wear protective gear. (doc. 3 at 16.; doc. 7 at 8.) Nor were they informed that the substance they were handling contained asbestos. (*Id.*) Plaintiff claims that he routinely cleaned all property being removed from storage areas of the dusty substance and black matter. (doc. 7 at 8.) It was also routine

---

[4]A copy is attached to the complaint. (*See* doc. 3 at 57.)

to navigate falling ceiling tiles or remove hanging ceiling tiles to avoid injury. (*Id.*)

After the storage areas were sealed in October 2018, Plaintiff was informed that his clothing and bedding needed to be exchanged due to extended exposure to the "10% asbestos and mold." (doc. 3 at 20.) In May 2019, an abatement company abated the material that "Plaintiff handled on a routine basis for over 200 plus days," and removed the ceiling and wall covering that were the sources of the asbestos. (*Id.* at 22.) During the abatement process, employees and staff of the abatement company wore protective suits. (*Id.*)

"During the cleaning process," Plaintiff started coughing excessively due to the odor coming from the room, and from "being in the room for a substantial part of the day cleaning." (doc. 7 at 7.) About a week after he started working in the warehouse, Plaintiff went to sick call for a cough, sore throat, and sinus issues. (doc. 3 at 16-17.) He was diagnosed with acute sinusitis and given medications. (*Id.* at 17.) During the cleaning process for storage area 2, he also witnessed other inmates with tissues in their noses due to bleeding. (doc. 7 at 7.) About three months after his initial sick call visit, Plaintiff visited sick call again, this time complaining of drainage issues. (doc. 3 at 17.) He purchased Claritin from the commissary. (*Id.*) Two weeks later, he went to sick call again and complained about coughing after taking the Claritin. (*Id.*) He was again diagnosed with acute sinusitis, prescribed a steroid nasal spray, and told to continue taking the Claritin. (*Id.*) Months later, in October 2018, Plaintiff again visited sick call and asked for his nasal spray to be refilled due to continued breathing issues. (*Id.* at 20.) Finally, on November 9, 2018, he visited sick call again "seeking medical treatment due to his extended exposure to cancer causing asbestos and mold." (*Id.*) He asserts that, "[u]p until the sealing of the two storage areas by the new safety manager in October 2018, I still experienced intermitten [sic] chronic coughs, throat raw and hurting and sinus drainage

issues. The symptoms subsided upon my exist [sic] from commisary warehouse on or around December 10, 2018." (doc. 7 at 9.)

Plaintiff contends that under federal Bureau of Prisons (BOP) regulations, all staff must be "trained in Asbestos Awareness," and institutions must provide a "safe and healthy environment for facility occupants, provide an environment free from recognized hazards likely to cause death or serious physical harm and ensure prompt abatement of unsafe and unhealthy working conditions." (doc. 3 at 10 (citing BOP PS 1600.11.)) "[A]s a result of [Defendants'] deliberate indifference to [his] serious risk of safety, medical and personal injury harm, [Plaintiff] was exposed to high dosage level of cancer causing asbestos and mold for over 200 plus days, causing serious medical and personal injury harm as reflected in [his] sick call visits and shortening of the life expectancy of [Plaintiff] and the quality of life as [he began] to suffer the effects of the prolonged exposure." (*Id.* at 23.)

On October 2, 2020, Defendants moved to dismiss this action for failure to state a claim upon which relief can be granted. (doc. 28.) Plaintiff responded, and Defendants replied. (docs. 31, 32.)

## II. RULE 12(b)(6)

Rule 12(b)(6) allows motions to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Under the 12(b)(6) standard, a court cannot look beyond the face of the pleadings. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *see also Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert denied*, 530 U.S. 1229 (2000). It is well-established that "*pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers." *Miller v. Stanmore*, 636 F.2d 986, 988 (5th Cir. 1981). Nonetheless, regardless of whether the plaintiff is proceeding *pro se* or is represented by counsel, pleadings must show specific, well-pleaded facts,

not mere conclusory allegations to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). The court must accept those well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker*, 75 F.3d at 196.

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). Nevertheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenant that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (citations omitted). When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 678.

As noted, a court cannot look beyond the pleadings in deciding a 12(b)(6) motion. *Spivey*,

197 F.3d at 774; *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings" with a Rule 12(b)(6) motion to dismiss or in response to a Rule 12(b)(6) motion to dismiss, a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 196 n.3 (5th Cir. 1988); *accord Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F.App'x 775, 783 (5th Cir. 2007); *Walch v. Adjutant General's Dep.t of Tex.*, 533 F.3d 289, 293-94 (5th Cir. 2008). If "matters outside of the pleading[s] are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Nevertheless, "pleadings" for purposes of a Rule 12(b)(6) motion include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Similarly, documents attached to a motion to dismiss or in response to a motion to dismiss "are considered part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim[s]." *Collins*, 224 F.3d at 499 (quotations omitted); *accord Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 725 (5th Cir. 2003); *see Walch*, 533 F.3d at 293-94 (finding that reliance on documents attached to a response to a motion to dismiss was appropriate where the documents were "sufficiently referenced in the complaint"). It is also "clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994). Accordingly, documents falling in these three categories may be properly considered without converting the motion to dismiss into a motion for summary judgment. *Ogbogu v. Navin*, No. 3:18-CV-1912-K-BH, 2019 WL 4307011, at *5-6 (N.D.

Tex. Aug. 16, 2019), *rep. and rec. adopted nom. Ogbogu v. Acting Sec'y of Labor*, No. 3:18-CV-1912-K, 2019 WL 4303102 (N.D. Tex. Sept. 11, 2019).

Here, Plaintiff submitted a standard prisoner's civil rights complaint form, with another operative complaint and other documents attached as exhibits. (doc. 3 at 7-8, 27-57; doc. 3-1 at 1-25). These attachments are pleadings for purposes of this Rule 12(b)(6) motion and may be considered without conversion of the motion to dismiss into a summary judgment motion. *See Collins*, 224 F.3d at 498.

### III. BIVENS

Plaintiff claims that Defendants were deliberately indifferent to a serious risk of harm to him, in violation of the Eighth Amendment's prohibition on the imposition of cruel and unusual punishments. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992). Although he filed his complaint using the standard form for § 1983 actions, § 1983 does not apply when only federal action is at issue. *See Williams v. Wood*, 612 F.2d 982, 984 n. 1 (5th Cir. 1980). Because Defendants are federal officers, Plaintiff's Eighth Amendment claims against them are fairly interpreted as arising under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See, e.g., Montgomery v. Deitelbaum*, No. 3:09-CV-2407-M, 2010 WL 582146, at *2 (N.D. Tex. Feb. 18, 2010) ("Because pro se complaints are liberally construed, the courts apply § 1983 or *Bivens* according to the actual nature of the claims, not the label or characterization of a pro se plaintiff.") (citation omitted). In *Bivens*, the Supreme Court held that the violation of a person's constitutional rights by a federal official may give rise to an action for monetary damages in federal court. *Bivens*, 403 U.S. 388. *Bivens* mirrors but is not "'the substantial equivalent of 42 U.S.C. § 1983.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (citation omitted).

**A.**     **"Physical Injury"**

Defendants first argue that Plaintiff's claims are barred by the physical injury exception. (doc. 28 at 14.)

The Prison Litigation Reform Act (PLRA) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury..." 42 U.S.C. § 1997(e)(e). The injury required by this statute "must be more than *de minimis* but need not be significant." *Alexander v. Tippah County, Mississippi*, 351 F.3d 626, 630-31 (5th Cir. 2003), *cert. denied*, 541 U.S. 1012 (2014).

Defendants cite case law indicating that ailments of the type alleged by Plaintiff (repeated sinus infections characterized by coughing, a sore throat, congestion, and drainage—at least unconnected with a disease caused by asbestos exposure) are *de minimis* and fail to satisfy the PLRA's physical injury requirement. *See, e.g., Mayes v. Travis State Jail*, No. A-06-CA-709-SS, 2007 WL 1888828 (W.D. Tex. 2007) (finding no proof of a physical injury to plaintiff where alleged exposure to mold resulted in sinus complaints); *Smith v. Fox*, C/A No. 4:05-1554-GRA-TER, 2006 WL 2090170, at *8 (D.S.C. 2006) (finding no proof of serious physical or emotional injury rising to a serious deprivation of a basic human need where plaintiff alleged that mold and mildew in his cell caused headaches, sinus infections, head cold, sores in nose, sores on side of mouth, and rash on arm); *Gill v. Shoemate*, No. Civ. A. 05-2124, 2006 WL 1285412, at *5 (W.D. La. May 8, 2006) (finding alleged injuries of headaches and eye and throat irritation were *de minimis*).

As Defendants also note, however, the Fifth Circuit has found that an inmate who complained of "headaches, sinus problems, trouble breathing, blurred vision, irritated eyes, and

11

fatigue" allegedly resulting from "poor prison conditions consisting of lead paint, mold, asbestos, and unsanitary food slots" had satisfied the PLRA's "physical injury" requirement. *See Smith v. Leonard*, 244 F.App'x 583, 584 (5th Cir. 2007). Although not precedential, the Fifth Circuit's decision in *Smith* is instructive. Plaintiff's allegations regarding his physical injury are not distinguishable from those in *Smith*, which were found sufficient to state a physical injury. Based on *Smith*, Defendants' motion to dismiss Plaintiff's complaint for failure to satisfy the "physical injury" requirement of the PLRA should be denied.

## B.  Actionable Claim

 Defendants next argue that after the Supreme Court's decision in *Abbasi*, Plaintiff's claims are no longer actionable under *Bivens*.  (doc. 28 at 16.)

As the Fifth Circuit recently noted, the United States Supreme Court has reiterated that "*Bivens* was the product of an '*ancien regime*' that freely implied rights of action." *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) (quoting *Abbasi*, 137 S.Ct. at 1855) (quoting in turn *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)).  *Bivens* claims are now generally relegated to the only three circumstances in which the Supreme Court allowed a private right of action against federal officers for constitutional violations: (1) "manacling the plaintiff in front of his family in his home and strip-searching him in violation of the Fourth Amendment," *see Bivens*, 403 U.S. at 389-90; (2) "discrimination on the basis of sex by a congressman against a staff person in violation of the Fifth Amendment," *see Davis v. Passman*, 442 U.S. 228 (1979); and (3) "failure to provide medical attention to an asthmatic prisoner in federal custody in violation of the Eighth Amendment," *see Carlson v. Green*, 446 U.S. 14 (1980). *Oliva*, 973 F.3d at 442.  To determine whether *Bivens* allows a cause of action, courts must consider: (1) whether a case involves a "new context" that is distinct

from these cases, and (2) whether any "special factors" preclude extending *Bivens* to this "new context." *Maria S. as Next Friend for E.H.F. v. Garza*, 912 F.3d 778, 784 (5th Cir. 2019) (citation omitted). Virtually anything other than the circumstances presented in *Bivens*, *Davis*, or *Carlson* is a "new context," generally precluding the existence of a *Bivens* remedy. *Id.* (citing *Abbasi*, 137 S.Ct. at 1865). The Supreme Court has recently emphasized that its "understanding of a 'new context' is broad." *Hernandez v. Mesa*, — U.S.—, 140 S.Ct. 735, 743 (2020). It has also made clear that extending *Bivens* to new contexts is now a "'disfavored' judicial activity." *Abbasi*, 137 S.Ct. at 1857.

### 1. *New Context*

In deciding whether a plaintiff's claim arises in a new context under *Bivens*, the "proper test" is whether the case "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 137 S.Ct. at 1859; *see also Cantú*, 933 F.3d 414, 422 (5th Cir. 2019) ("Courts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" "Indeed, it is not enough even if 'a plaintiff asserts a violation of the same clause of the same amendment *in the same way*." *Oliva*, 973 F.3d at 442 (quoting *Cantú*, 933 F.3d at 422) (emphasis in original); *see also Canada v. United States*, 950 F.3d 299, 307 (5th Cir. 2020) ("Canada contends that the Supreme Court recognized a *Bivens* claim for Fifth Amendment Due Process violations in *Davis*, and thus his claims do not present a new Constitutional context. His reliance on *Davis* is misplaced. The Supreme Court has made clear that claims for violations of Fifth Amendment rights can still be brought in a new context. To be sure, '[n]o one thinks *Davis*—which permitted a congressional employee to sue for unlawful termination in violation of the Due Process Clause—means the entirety of the Fifth

Amendment's Due Process Clause is fair game in a *Bivens* action.'") (quoting *Cantú*, 933 F.3d at 422). Although it did not "endeavor[] to create an exhaustive list of differences that are meaningful enough to make a given context a new one," the Supreme Court provided some examples that might be instructive:

> A case might differ in a meaningful way because the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1859-60.

Here, Plaintiff tries to liken this case to *Carlson*, which also involved an Eighth Amendment deliberate indifference claim, by specifically arguing that he is not asserting a conditions of confinement claim, but rather, a claim that "deliberate indifference occurred due to defendants [sic] disregard for his medical condition after being exposed to hazardous substances." (doc. 31 at 25.) *Carlson* involved a medical indifference claim premised upon the failure to provide adequate medical treatment, however. Although Plaintiff claims that Defendants were deliberately indifferent by not "addressing the root cause of the visible medical symptoms," he does not take issue with the medical treatment he received. Notably, he did not name any medical officer as a defendant. His allegations are centered upon the failure to provide a safe working environment. Because he does not contest the medical treatment he received, Plaintiff's claims arise in a new context under *Bivens*.

This finding is consistent with the one in another recent *Bivens* case in this district. In *Dudley v. United States*, No. 4:19-cv-317-O, 2020 WL 532338 (N.D. Tex. Feb. 3, 2020), the plaintiff alleged deliberate indifference to her health and safety under the Eighth Amendment based on an alleged failure to protect her from verbal and psychological abuse, threats, and harassment at

the hands of fellow inmates. Rejecting her argument that her claim was the same as in *Carlson* because it arose under the Eighth Amendment, the court noted that "*Carlson* had only recognized an implied damages remedy under the Eighth Amendment for '*failure to provide medical treatment.*'" 2020 WL 532338, at *5 (emphasis added). Other courts have reached similar conclusions. *See Schwarz v. Meinberg*, 761 F. App'x. 732, 734 (9th Cir. 2019) ("Schwarz's Eighth Amendment claim regarding unsanitary cell conditions presents a new *Bivens* context because Schwarz does not allege a failure to treat a serious medical condition, which was the issue in *Carlson*... Rather the basis of Schwarz's claim—a nonfunctioning toilet—resembles the conditions of the confinement claim the Supreme Court rejected in *Abbasi*."); *Hoffman v. Preston*, No. 1:16-cv-01617-LJO-SAB (PC), 2019 WL 5188927, at *5 (E.D. Cal. Oct. 15, 2019), *Rep. and Rec. adopted*, 2020 WL 58029 (E.D. Cal. Jan. 6, 2020) ("In this case, Plaintiff's Eighth Amendment claim differs meaningfully from the Eighth Amendment claim in *Carlson* because Plaintiff's claim arises out of allegations that a correctional officer offered to pay inmates to harm Plaintiff and labeled Plaintiff a snitch in front of other inmates, not failure to provide medical care. Therefore, Plaintiff's Eighth Amendment failure to protect claim accordingly arises in a new *Bivens* context.").[5]

Because Plaintiff's claims arise in a new context under *Bivens*, consideration of whether any "special factors" counsel hesitation in recognizing a new judicial remedy is required.

### 2. *Special Factors Analysis*

"When a purported *Bivens* claim is asserted in a new context, *Abbasi* requires consideration of whether 'special factors' counsel against inferring such a cause of action in the absence of

---

[5]Additionally, *Carlson* involved deliberate indifference to the medical needs of one prisoner. Here, Plaintiff's claims are more general in nature and are targeted at a prison policy concerning exposing inmates to asbestos—not just his individual circumstances. This is a distinction the Supreme Court specifically mentioned in *Abbasi* as potentially significant. *See Abbasi*, 137 S. Ct. at 1859-60.

'affirmative action by Congress' to create one.'" *Dudley*, 2020 WL 532338, at \*6 (quoting *Abbasi,* 137 S.Ct. at 1857). This "inquiry must concentrate on whether the judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi,* 137 S.Ct. at 1857-58. A *Bivens* remedy should not be inferred if "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong." *Id.* at 1858. "[I]f there is an alternative remedial structure present in a certain case," the existence of that process "alone may limit the power of the judiciary to infer a new *Bivens* cause of action." *Id.*

Here, special factors counsel against extending *Bivens* to Plaintiff's deliberate indifference claims. First, Congress has already legislated extensively with respect to prisoners' rights, and "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." *Id.* at 1865. "Some 15 years after *Carlson* was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court." *Id.* (citing 42 U.S.C. § 1997(e)). "So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs." *Id.* "*Abbasi* makes clear that Congress could have extended the *Carlson* damages remedy to cases involving other types of prisoner mistreatment, but chose not to do so." *Dudley*, 2020 WL 532228, at \*7.

Courts considering the extension of *Bivens* to new areas in the prison context have also noted that the "administration of the federal prison system" is a special factor counseling hesitation against such expansion. *See Nabaya v. Bureau of Prisons*, 3:19-CV-215-L-BN, 2020 WL 7029909, at \*5 (N.D. Tex. Oct. 7, 2020), *Rep. and Rec. adopted* 2020 WL 7027470 (N.D. Tex. Nov. 30, 2020); *see*

*also Retzold v. Rostollan*, 946 F.3d 242, 248 n.2 (5th Cir. 2019) ("[We are unlikely to imply a *Bivens*

remedy for this new context as 'special factors' counsel hesitation in federal prison administration.")

(citing *Abbasi*, 137 S. Ct. at 1857-58); *Callahan v. Fed. Bureau of Prisons*, 956 F.3d 520, 524 (6th

Cir. 2020) ("'[L]egislative action suggesting that Congress does not want a damages remedy'

counsels against judicial do-it-yourself projects. Congress paid close attention to inmate

constitutional claims when it enacted the [PLRA]. The Act 'does not provide for a standalone

damages remedy against federal jailers.'") (quoting *Abbasi*, 137 S. Ct. at 1865) (citations omitted).

In addition, an alternative remedial process exists for Plaintiff, i.e., the Federal Bureau of

Prisons' Administrative Remedy Program. "Under this program, prisoners can file grievances about

any aspect of their confinement, the agency must provide written responses in specified time frames,

and prisoners may appeal institutional-level responses to the agency's regional and central offices."

*Dudley*, 2020 WL 532338, at *8 (citing 28 C.F.R. §§ 542.10-19 (2017)). Since *Abbasi*, numerous

courts have recognized the Federal Bureau of Prisons' Administrative Remedy Program as an

alternative process and a special factor that forecloses expansion of the *Bivens* remedy. *See, e.g.,*

*Dudley*, 2020 WL 532338, at *7; *Begay v. Leap*, No. 3:17-CV-2639-N-BT, 2019 WL 1318410, at

*3 (N.D. Tex. Feb. 6, 2019), *Rep. and Rec. adopted*, 2019 WL 1315901 (N.D. Tex. Mar. 22, 2019)

("[S]everal courts have explicitly recognized the administrative remedy program ('ARP') available

in the prison setting as an alternative process foreclosing a personal-capacity damages remedy")

(quoting *Brunson v. Nichols*, 2018 WL 7286410, at *3 (W.D. La. Dec. 7, 2018), *Rep. and Rec.*

*adopted*, 2019 WL 545479 (W.D. La. Feb. 11, 2019)).[6]

---

[6] Defendants contend that the Inmate Accident Compensation Act, codified at 18 U.S.C. § 4126 *et seq.* also provides a "more than adequate remedy" to Plaintiff. Doc. 28 at 20. The IACA authorizes the Federal Prison Industries to compensate inmates "for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined." 18 U.S.C. § 4126(c)(4). The Fifth Circuit does not

Because Plaintiff's *Bivens* claims involve a new context under *Abbasi*, and because special factors exist counseling against the extension of *Bivens* to such claims, Defendants' motion should be granted, and his claims should be dismissed with prejudice.

## C.   Deliberate Indifference

Alternatively, Defendants argue that Plaintiff's allegations fail to demonstrate deliberate indifference.

"While the Constitution does not require that custodial inmates be housed in comfortable prisons, the Eighth Amendment's prohibition against cruel and unusual punishment does require that prisoners be afforded 'humane conditions of confinement' and prison officials are to ensure that inmates receive adequate food, shelter, clothing, and medical care." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). To establish an Eighth Amendment conditions of confinement claim, the inmate must first establish that the deprivation alleged was sufficiently serious; that is, that an official's act or omission must have resulted in the denial of "the minimal civilized measure of life's necessities." *See id.* at 1977. Next, the inmate must show that the prison official possessed a sufficiently culpable state of mind. *Id.* "The required state of mind for cases related to prison conditions is that the official acted with deliberate indifference to inmate health or safety." *See Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999). Deliberate indifference is established by showing that the defendant officials "(1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be shown and (2) that

---

appear to have addressed this argument, and at least one appellate court has explicitly rejected it. *See Bagola v. Kindt*, 131 F.3d 632, 639 (7th Cir. 1997) (rejecting argument that the availability of the IACA to an injured inmate precluded a *Bivens* remedy because the statute, which establishes a no-fault worker's compensation system, does not further goals of deterrence). Because other factors counsel against extending a *Bivens* remedy to these facts, it is not necessary to determine whether the IACA precludes a *Bivens* cause of action here.

they actually drew an inference that such potential for harm existed." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).

As for the first prong of the analysis, that the deprivation was sufficiently serious, the Supreme Court has held that the Eighth Amendment protects prisoners from deliberate indifference to conditions that pose an unreasonable threat to their future health. *See Helling v. McKinney*, 509 U.S. 25 (1993) (holding that an inmate may obtain injunctive relief under § 1983 based on exposure to environmental tobacco smoke in the absence of a present physical injury). Courts have noted that "mere exposure to moderate levels of asbestos is not actionable because asbestos remains in many public buildings throughout the country." *Labounty v. Coughlin,* 137 F.3d 68, 74, n.5 (2d Cir. 1998). They have instead focused on whether inmates are exposed to unreasonably high amounts of friable asbestos.[7] The Fifth Circuit has found that inmates' unwilling exposure to an unreasonably high concentration of air-borne asbestos particles constitutes a cognizable claim under the Eighth Amendment. *See Herman*, 238 F.3d at 664-65; *see also Powell v. Lennon*, 914 F.2d 1459, 1463-64 (11th Cir. 1990) (denying qualified immunity to prison officials where plaintiff alleged friable asbestos particles were in the air of the prison dormitory and yet prison officials refused to remove him to another area); *LaBounty*, 137 F.3d at 74; (denying qualified immunity as to inmate's claim that he was exposed to friable asbestos after alerting the prison officials of the same, noting that "LaBounty's request to be kept in an asbestos-free environment constituted a serious medical need.").

Exposure to friable asbestos poses a significant health risk because airborne particles or fibers can become lodged in a person's lungs and in his respiratory tract. Over time this can

---

[7] The term "friable asbestos" means asbestos that is "exposed and readily crumbled, as opposed to contained." *See Pack v. Artuz*, 348 F.Supp.2d 63, 79 (S.D.N.Y. 2004).

lead to asbestosis, a nonmalignant scarring of the lungs that causes extreme shortness of breath and often death; lung cancer; gastrointestinal cancer; and mesothelima, a cancer of the lung lining or abdomen lining that develops as long as thirty years after the first exposure to asbestos and that, once developed, invariable and rapidly causes death.

*Pack*, 348 F.Supp.2d at *79. (citing *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 50 (2d Cir. 1988)).

Here, Plaintiff alleges that he was exposed to friable asbestos for months while tasked with cleaning storage rooms. These allegations would normally satisfy the objective component of the conditions-of-confinement analysis. Notably, Plaintiff's complaint includes a memorandum from the new safety supervisor regarding test results indicating that there was no airborne asbestos in the warehouse. Nevertheless, accepting Plaintiff's well-pleaded facts as true and viewing them in the light most favorable to him, *see Baker*, 75 F.3d at 196, his allegations of prolonged exposure to friable asbestos are sufficient to satisfy the objective component of the conditions of confinement analysis.

As for exposure to mold, an unpublished decision from the Fifth Circuit found that mold exposure may satisfy the objectively-serious component of the conditions-of-confinement analysis. *See Smith*, 244 F.App'x at 584 (inmate stated constitutional claim where he complained of poor prison conditions consisting of "lead paint, mold, asbestos, and unsanitary food slots" and suffered "headaches, sinus problems, trouble breathing, blurred vision, irritated eyes, and fatigue" as a result of the same). The bulk of district court jurisprudence in this Circuit is to the contrary. *See, e.g., White v. Lewis*, No. 1:16-CV-1074-P, 2016 WL 9225258, at *3 (W.D. La. Dec. 14, 2016) (dismissing conditions of confinement claim based upon the alleged presence of black mold and noting that, "[t]here are many different types of mold, not all of which are toxic. The mere fact that mold is present does not render Plaintiff's confinement unconstitutional"); *Smith v. Gusman*, Civil

Action No. 14-1153-DEK, 2015 WL 2066517, at *2 (E.D. La. May 4, 2015) ("However, the jurisprudence has repeatedly held that the mere fact that mold is present in a jail does not render an inmate's confinement unconstitutional.") (collecting cases). The Court assumes for purposes of its analysis that exposure to "breathtaking mold" is the type of "sufficiently serious" condition necessary to meet the objective prong of the conditions of confinement analysis. *Farmer*, 511 U.S. 825 at 835.

As for the second prong of the analysis, Plaintiff must also demonstrate that Defendants acted with the necessary deliberate indifference by alleging facts sufficient to support a reasonable inference that Defendants knew that of a substantial risk of bodily harm to him, but disregarded that risk by failing to take reasonable measures to abate it. *Taylor v. Stevens*, 946 F.3d 211, 221 (5th Cir. 2019). He makes the following allegations regarding their awareness of the risk: (1) the United States is required to presume its buildings constructed prior to 1980 were constructed with material containing asbestos; (2) the warehouse had previously been abated as evidenced by the installation over the piping due to asbestos on the pipes; (3) a member of the warehouse staff informed Plaintiff about a report "generated many years prior to this incident, stating that the warehouse was asbestos free"; (4) on or about September 1, 2017, the warehouse supervisor emailed Administrator "about the continued falling substance in both storage areas requiring daily cleaning and removal and the strong odor emanating from the rooms"; (5) on or about September 30, 2017, Defendants visited the warehouse to view the substances falling down from the ceiling and the overall condition of the storage areas; (6) on or about October 27, 2017, Administrator, wearing a "full body suit and respiratory protection," decided to test the black substances and determined both the substance and the smell to be mildew only; (7) on that same date, Administrator sprayed a soapy smelling

substance in both rooms; (8) on numerous occasions after the October 27, 2017 visit, inmates still experienced nose bleeds and upper respiratory breathing issues and notified their direct superior (not Administrator or Warden); (9) while Administrator knew or should have known of the continued issues relating to the toxic substances in the warehouse, he never returned to the warehouse to address the inmates continued complaints; (10) Administrator used a deficient testing methodology; and (11) many inmates, but not Plaintiff, were provided with an "Initial Job Orientation Sheet," which included a section entitled "Asbestos and Lead Awareness" stating that "Inmate has been instructed on asbestos containing material and items coated with lead-based paint may be present in some of the building material through-out the institution." (*See* doc. 31 at 25.)[8]

These allegations do not allow the Court to "reasonably infer" deliberate indifference. Even assuming the building at issue was constructed from material containing asbestos, as discussed above, that is not determinative—the question is whether Plaintiff was exposed to unreasonable amounts of it. According to Plaintiff, all indications pointed to a lack of friable asbestos exposure. He alleges there was "installation" over the pipes, the most recent report indicated no asbestos, and the test conducted by Administrator also revealed no asbestos. To conclude that—simply because he knew of inmate breathing issues and bleeding noses and conducted testing in protective gear—Administrator knew that inmates were exposed to friable asbestos fails to cross the line from mere possibility to plausibility. Though these allegations are arguably *consistent* with a subjective awareness of friable asbestos exposure, that is insufficient to state a claim. *See Iqbal*, 556 U.S. at

---

[8] This allegation was not in Plaintiff's complaint, but it does not change the analysis. That certain inmates were provided with material indicating asbestos might be present in the facility is insufficient to support a reasonable inference that Defendants ever harbored subjective knowledge that Plaintiff was exposed to unreasonable amounts of it. To the extent Plaintiff's inclusion of this allegation in his response brief may be construed as a motion to amend, it should be denied as futile. *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014).

678. ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557).[9]

Plaintiff makes much of the fact that inmates had continued health problems *after* Administrator completed his initial testing and cleaning of the storage areas. There are no allegations that Administrator even knew of these medical complaints–much less that he believed them to be due to asbestos exposure, however. The same is true for the alleged exposure to "breath taking mold." Plaintiff's allegations against Administrator fail to support a reasonable inference that he knew of the mold exposure when he conducted testing and determined the substance to be mildew.

As for Warden, his only alleged involvement was visiting the warehouse with Administrator on "September 30, 2017." Based the complaint, his liability appears to stem mostly, if not entirely, from his status as Administrator's supervisor. (*See* doc. 7 at 3 (Plaintiff's MJQ responses asserts that Warden, as Administrator's "direct supervisor, agreed with the testing methodology, results and [Administrator's] acts or omissions as it relates to the toxic substances in the warehouse up to and including not addressing the falling ceiling tiles inmates continue to have to maneuver and clear when accessing the storage areas").) A supervisory official can be held liable on a theory of supervisor liability "if (1) the supervisor affirmatively participates in the acts that cause the constitutional deprivation, or (2) the supervisor implements unconstitutional policies that causally

---

[9] To the extent that Plaintiff suggests that Defendants knowingly used a defective testing methodology, Plaintiff provides no facts to support this conclusory assertion. *See Ramirez v. Exxon Mobil Corp.*, 334 F.Supp.3d 832, 843 (N.D. Tex. 2018) ("Thus, courts no not accept 'conclusory allegations, unwarranted deductions, or legal conclusions,' at the motion to dismiss stage.") (quoting *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).

result in the constitutional injury." *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018). There is no basis in the law for supervisory liability by ratification based upon Warden's alleged agreement with Administrator's "acts or omissions," however. *See, e.g., Camacho v. City of El Paso, Tex.*, No. EP-15-CV-00318-PRM-RFC, 2016 WL 3519662, at *14 (W.D. Tex. June 22, 2016) ("[T]his Court is aware of no cases that impose post-violation ratification liability on a supervisor in his individual capacity."); *Hobart v. City of Stafford*, 916 F.Supp.2d 783, 799 (S.D. Tex. 2013) ("This Court is aware of, and Plaintiffs have cited, no liability on a supervisor based upon ratification.").

In conclusion, Plaintiff fails to state a claim for deliberate indifference against Defendants, and his claims are also subject to dismissal on this basis.[10]

### IV. OPPORTUNITY TO AMEND

The Fifth Circuit is inclined to give *pro se* plaintiffs several opportunities to state a claim upon which relief can be granted. *See Scott v. Brynes*, No. 3:07-CV-1975-D, 2008 WL 398314, at *1 (N.D. Tex. Feb. 13, 2008); *Sims v. Tester*, No. 3:00-CV-0863-D, 2001 WL 627600, at *2 (N.D. Tex. Feb. 13, 2001). Courts therefore typically allow *pro se* plaintiffs an opportunity to amend their complaints when the action is to be dismissed pursuant to a court order. *See Robinette v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 3:96-CV-2923-D, 2004 WL 789870, at *2 (N.D. Tex. Apr. 12, 2004); *Sims*, 2001 WL 627600, at *2. Nonetheless, a court need not give an opportunity to amend where the court finds that the plaintiff has alleged his or her best case. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999).

---

[10] Defendants also argue that, even assuming Plaintiff has plead a constitutional violation, the qualified immunity defense nonetheless precludes liability. Because Plaintiff has failed to plead a constitutional violation, this argument is not reached.

Here, the deliberate indifference claims Plaintiff pursues are simply not cognizable under *Bivens*, so no opportunity to amend is warranted. *See Ricardo v. Bank of New York Mellon*, CIVIL ACTION H-16-3238, 2017 WL 3424975, at *16 (S.D. Tex. Aug. 9, 2017) (noting that leave to amend should be denied if the Court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face…") (quoting 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Proc.* § 1487 (2d ed. 1990)).

## V. RECOMMENDATION

The defendants' motion to dismiss should be granted in part, and the plaintiff's claims under *Bivens* should be **DISMISSED** with prejudice.

**SO RECOMMENDED** on this 30th day of April, 2021.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

# INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE